

# PAVAN PARIKH
# HAMILTON COUNTY CLERK OF COURTS

## COMMON PLEAS DIVISION

**ELECTRONICALLY FILED**
**May 3, 2023 10:09 AM**
**PAVAN PARIKH**
**Clerk of Courts**
**Hamilton County, Ohio**
**CONFIRMATION 1315818**

### KARA MCCORMICK

A 2301848

vs.

### INDUSTRIAL SECURITY
### SERVICE LLC DBA
### GARDAWORLD SEC

**FILING TYPE: INITIAL FILING (IN COUNTY) WITH JURY DEMAND**

**PAGES FILED: 19**

EFR200

## IN THE COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| KARA MCCORMICK<br>48 Evergreen Ct.<br>Cincinnati, OH 45215 | ) <br> ) <br> ) <br> ) | CASE NO. <br><br> JUDGE: |
|         Plaintiff, | ) <br> ) | |
|         v. | ) <br> ) | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| INDUSTRIAL SECURITY SERVICE,<br>LLC d/b/a GARDAWORLD SECURITY<br>SERVICES<br>4600 Dues Dr.<br>Cincinnati, OH 45246 | ) <br> ) <br> ) <br> ) <br> ) <br> ) | **(JURY DEMAND ENDORSED HEREIN)** |
|    **Serve also:**<br>   INDUSTRIAL SECURITY<br>   SERVICE, LLC d/b/a<br>   GARDAWORLD SECURITY<br>   SERVICES<br>   7610 Falls of Neuse Rd., Ste. 290<br>   Raleigh, NC 27615 | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
|    -and- | ) <br> ) | |
|    INDUSTRIAL SECURITY<br>   SERVICE, LLC d/b/a<br>   GARDAWORLD SECURITY<br>   SERVICES<br>   c/o CT Corp. System (Stat. Agent)<br>   4400 Easton Cmns., Ste. 125<br>   Columbus, OH 43219 | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
|         Defendant. | ) <br> ) | |

Plaintiff Kara McCormick by and through undersigned counsel, as her Complaint against

the Defendant, states and avers the following:

## PARTIES

1. McCormick is a resident of the city of, Hamilton County, Ohio.

2. Defendant INDUSTRIAL SECURITY SERVICE, LLC d/b/a GARDAWORLD SECURITY SERVICES ("GardaWorld") is a foreign limited liability company that conducts business throughout the state of Ohio.

3. GardaWorld is, and was at all times hereinafter mentioned, McCormick's employer within the meaning of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA") 42 U.S.C. 126 § 12101 et seq., and Ohio R.C. §4112, et seq.

4. Within 300 days of the adverse employment actions described herein, McCormick dual-filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and Ohio Civil Rights Commission ("OCRC") against GardaWorld, Charge No. 473-2022-01827 ("EEOC Charge").

5. On or about February 2, 2023, the EEOC issued and mailed a Notice of Right to Sue letter to McCormick regarding her EEOC Charge.

6. McCormick received the Notice of Right to Sue letter from the EEOC in accordance with 42 U.S.C. § 200e-5(f)(1), which had been attached hereto as Plaintiff's Exhibit 1.

7. McCormick has filed this Complaint on or before the 90-day deadline set forth in the Notice of Right to Sue letter.

8. McCormick has properly exhausted all administrative remedies pursuant to 29 C.R.F. § 1614.407(b).

**JURISDICTION & VENUE**

9. All of the material events alleged in this Complaint occurred in or around Hamilton County, Ohio.

10. Therefore, personal jurisdiction is proper over Defendant pursuant to R.C. § 2307.382(A)(1) and/or (3).

2

11. Venue is proper pursuant to Civ. R. 3(C)(1), (3), and/or (6).

12. This Court is a court of general jurisdiction over the claims presented herein, including all subject matters of this Complaint.

## FACTS

13. McCormick is a former employee of GardaWorld.

14. At all times noted herein, McCormick was qualified for her position with GardaWorld.

15. At all times noted herein, McCormick could fully perform the essential functions of her job, with or without a reasonable accommodation.

16. McCormick worked for GardaWorld as a security guard from February 16, 2022 until GardaWorld unlawfully constructively terminated McCormick's employment on or about May 19, 2022.

17. McCormick is a woman, placing her in a protected class for her sex/gender.

18. McCormick suffers from anxiety and depression, placing her in a protected class for disability.

19. GardaWorld had notice of McCormick's protected classes during her employment.

20. During her time at GardaWorld, McCormick faced repeated instances of sex/gender and disability discrimination, as well as retaliation.

21. McCormick's early employment generally went well.

22. However, McCormick once had to call out sick for illness.

23. Following this call-out, as McCormick was talking to supervisor Charles LNU (Male), the topic of her disabilities came up.

24. Charles LNU told McCormick that he "could tell [McCormick] had issues."

25. This comment was harassment based on McCormick's disabilities.

3

26. On or about May 16, 2022, McCormick called out for the second time, due to issues with her primary job.

27. GardaWorld investigated the situation after McCormick's second absence.

28. However, nothing came of this investigation, and McCormick was caused unnecessary stress which aggravated her anxiety and pushed her to tears.

29. Charles LNU then sent a message to McCormick for her to call him.

30. They talked about McCormick's job and the effect it had on her disabilities, and Charles LNU mentioned he was not sure if she could do her job with her disabilities. This conversation, among their previous conversations about her health, imputed knowledge of McCormick's protected disability class upon GardaWorld.

31. This was blatant discrimination based on McCormick's disabilities.

32. On or about the night of May 17 into the morning of May 18, 2022, McCormick was working her regular overnight shift.

33. Charles LNU approached McCormick and started talking about how GardaWorld had a "strict policy on lateness."

34. This confused McCormick, who remembered only three occasions out of her entire employment where she had been late.

35. Charles LNU told McCormick that was not what he heard, and that second shift employee Mike LNU (Male) said she was late every day.

36. McCormick denied this and Charles LNU said he would get that information to her later on.

37. McCormick then sent a message to HR generalist Valerie Brandenburg (Female), concerned that she was going to be terminated for false reasons.

4

38. McCormick described the clock-in system of phoning a number from the office desk phone and mentioned how the system had many issues that would cause her to be logged as late when she was not.

39. McCormick also said that she felt Mike LNU was harassing her. This was a protected complaint.

40. McCormick sent a screenshot of this message to Charles LNU afterward.

41. Charles LNU messaged McCormick back and said she was unnecessarily harsh in her email to Brandenburg.

42. McCormick then had a call with Brandenburg where Brandenburg told McCormick that she had no idea what McCormick was talking about.

43. Brandenburg told McCormick that she had no known issues for her so she would call Charles LNU instead to find out what was happening.

44. During this call, McCormick also mentioned that she felt targeted and harassed due to her disability and sex/gender - another protected complaint of discrimination.

45. McCormick then went in the next night to work the overnight shift of May 18-19, 2022.

46. When McCormick got there, she was met by Charles LNU and Mike LNU.

47. Charles LNU said he wanted to squash the issue now, so McCormick directly told him she did not appreciate the lie that she was late.

48. Charles LNU told McCormick that he received the records from Brandenburg, and McCormick had been one-to-two minutes late every day.

49. McCormick asked for a copy of these records, but Charles LNU claimed he did not have any.

E-FILED 05/03/2023 10:09 AM / CONFIRMATION 1315818 / A 2301848 / COMMON PLEAS DIVISION / IFIJ

50. The two went back and forth, and Charles LNU then said McCormick looked "like a cat with its hair standing up."

51. McCormick found this to be very demeaning and harassing based on her anxiety and her sex/gender.

52. McCormick reiterated the issue with the phone clock-in method and mentioned that Brandenburg did not mind negligible amounts of lateness like one or two minutes.

53. However, Charles LNU said that counted as late anyway. This implied to McCormick that GardaWorld was creating a pretextual basis to terminate her employment.

54. After the constant harassment and discrimination, McCormick, like any reasonable person, felt she had no choice left but to resign on or about May 19, 2022.

55. After being forced to resign, McCormick emailed Brandenburg to say that she felt she was discriminated against for her sex/gender and disability, and that was why she was forced into resigning.

56. Brandenburg did not reply to McCormick's email and refused to provide her with any documents.

57. This constructive termination of McCormick's employment constituted an adverse employment action.

58. The above facts demonstrate that GardaWorld engaged in a pattern and practice of sex/gender discrimination.

59. The above facts demonstrate that GardaWorld engaged in a pattern and practice of actual or perceived disability discrimination.

60. There was a causal connection between McCormick's sex/gender and Defendant's constructive termination of McCormick.

6

61. There was a causal connection between McCormick's disability and Defendant's constructive termination of McCormick.

62. GardaWorld's purported reason for McCormick's constructive employment termination was pretextual.

63. GardaWorld actually constructively terminated McCormick's employment in an act of sex/gender discrimination.

64. GardaWorld actually constructively terminated McCormick's employment in an act of disability discrimination.

65. GardaWorld actually constructively terminated McCormick's employment in violation of public policy.

66. As a result of the above, McCormick has suffered and will continue to suffer damages.

## COUNT I: GENDER DISCRIMINATION IN VIOLATION OF R.C. §4112 et seq.

67. McCormick restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

68. McCormick is a member of a statutorily protected class based on her gender under R.C. § 4112.02.

69. Defendant treated McCormick differently than other similarly situated employees based on her gender.

70. Defendant discriminated against McCormick based on her gender throughout her employment with the company.

71. McCormick was the only female employee at her site at the time.

72. While at GardaWorld, McCormick felt targeted and harassed for her sex/gender.

73. McCormick was reprimanded for showing up to work one to two minutes late.

7

74. However, no male employee was reprimanded for showing up late.

75. McCormick was compared to a cat with its hair standing up - another frequent sexist trope of referring to women as catty.

76. This demonstrates the disparate treatment between male and female employees at GardaWorld.

77. This disparate treatment became one of McCormick's cited reasons for leaving.

78. Defendant condoned, tolerated, and ratified this disparate treatment.

79. This disparate treatment was severe and/or pervasive.

80. This disparate treatment was offensive to McCormick.

81. This disparate treatment would also be offensive to any reasonable person.

82. This disparate treatment interfered with McCormick's ability to perform her job duties.

83. This disparate treatment was based on McCormick's sex/gender.

84. This disparate treatment was so severe that it materially altered the conditions of McCormick's employment.

85. Any reasonable person in McCormick's place would also have no choice but to resign due to the conduct.

86. McCormick, with no other reasonable choice, was then forced to resign from her employment.

87. McCormick's resignation was a constructive termination, an adverse employment action.

88. Defendant constructively terminated McCormick's employment without just cause.

89. Alternatively, Defendant's cited reason for McCormick's constructive termination was pretext.

90. Defendant constructively terminated McCormick's employment based on her gender.

8

91. Defendant's discrimination against McCormick based on her gender violates R.C. § 4112.01 *et seq.*

92. McCormick suffered emotional distress as a result of the Defendant's conduct, and is entitled to emotional distress damages pursuant to R.C. § 4112.01 *et seq.*

93. As a direct and proximate result of Defendant's conduct, McCormick suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

**COUNT II: GENDER DISCRIMINATION IN VIOLATION OF TITLE VII**

94. McCormick restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

95. McCormick is a member of a statutorily protected class based on her gender under Title VII.

96. Defendant treated McCormick differently than other similarly situated employees based on her gender.

97. Defendant discriminated against McCormick based on her gender throughout her employment with the company.

98. McCormick was the only female employee at her site at the time.

99. While at GardaWorld, McCormick felt targeted and harassed for her sex/gender.

100. McCormick was reprimanded for showing up to work one to two minutes late.

101. However, no male employee was reprimanded for showing up late.

102. McCormick was compared to a cat with its hair standing up - another frequent sexist trope of referring to women as catty.

9

103. This demonstrates the disparate treatment between male and female employees at GardaWorld.

104. This disparate treatment became one of McCormick's cited reasons for leaving.

105. Defendant condoned, tolerated, and ratified this disparate treatment.

106. This disparate treatment was severe and/or pervasive.

107. This disparate treatment was offensive to McCormick.

108. This disparate treatment would also be offensive to any reasonable person.

109. This disparate treatment interfered with McCormick's ability to perform her job duties.

110. This disparate treatment was based on McCormick's sex/gender.

111. This disparate treatment was so severe that it materially altered the conditions of McCormick's employment.

112. Any reasonable person in McCormick's place would also have no choice but to resign due to the conduct.

113. McCormick, with no other reasonable choice, was then forced to resign from her employment.

114. McCormick's resignation was a constructive termination, an adverse employment action.

115. Defendant constructively terminated McCormick's employment without just cause.

116. Alternatively, Defendant's cited reason for McCormick's constructive termination was pretext.

117. Defendant constructively terminated McCormick's employment based on her gender.

118. Defendant's discrimination against McCormick based on her gender violates Title VII.

119. McCormick suffered emotional distress as a result of the Defendant's conduct, and is entitled to emotional distress damages pursuant to Title VII.

10

120. As a direct and proximate result of Defendant's conduct, McCormick suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## COUNT III: DISABILITY DISCRIMINATION IN VIOLATION OF R.C. §4112 et seq.

121. McCormick restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

122. McCormick suffers from anxiety and depression, placing her in a protected class for disability.

123. At the time of the relevant events of this Complaint, McCormick was disabled.

124. In the alternative, GardaWorld perceived McCormick as being disabled.

125. McCormick's condition constituted a physical impairment.

126. McCormick's condition substantially impaired one or more of her major life activities including working.

127. GardaWorld perceived McCormick's condition to substantially impair one or more of her major life activities including working.

128. GardaWorld treated McCormick differently than other similarly-situated employees based on her disabling condition.

129. GardaWorld treated McCormick differently than other similarly-situated employees based on her perceived disabling condition.

130. When McCormick first gave notice of her disability to Charles LNU, Charles LNU told her that he "could tell [McCormick] had issues."

131. Then, on or about May 16, 2022, McCormick was subjected to an investigation that was groundless and aggravated her disabilities.

11

132. McCormick was pushed to the point of tears, despite GardaWorld having notice of her anxiety.

133. Charles LNU then told McCormick he didn't think she could do her job because of her disabilities.

134. At all times, McCormick was fully capable of completing her essential job functions.

135. On or about May 18, 2022, Charles LNU described McCormick as a "cat with its hair standing up" despite having knowledge of her anxiety.

136. This constant harassment that McCormick faced for her disabilities constituted disability discrimination.

137. None of McCormick's able-bodied coworkers faced this kind of treatment.

138. This harassment was one of McCormick's cited reasons for leaving.

139.  Defendant condoned, tolerated, and ratified this harassment.

140. This harassment was severe and/or pervasive.

141. This harassment was offensive to McCormick.

142. This harassment would also be offensive to any reasonable person.

143. This harassment interfered with McCormick's ability to perform her job duties.

144. This harassment was based on McCormick's sex/gender.

145. This harassment was so severe that it materially altered the conditions of McCormick's employment.

146. Any reasonable person in McCormick's place would also have no choice but to resign due to this harassment.

147. McCormick, with no other reasonable choice, was then forced to resign from her employment.

12

148. McCormick's resignation was a constructive termination, an adverse employment action.

149. Defendant constructively terminated McCormick's employment based on her disability.

150. Defendant constructively terminated McCormick's employment based on her perceived disability.

151. Alternatively, Defendant's cited reason for McCormick's constructive termination was pretext.

152. Defendant violated R.C. § 4112.02 when it constructively discharged McCormick based on her disability.

153. Defendant violated R.C. § 4112.02 when it constructively discharged McCormick based on her perceived disability.

154. McCormick suffered emotional distress as a result of Defendant's conduct, and is entitled to emotional distress damages pursuant to R.C. § 4112.01 *et seq.*

155. As a direct and proximate result of Defendant's conduct, McCormick suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## COUNT IV: DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA

156. McCormick restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

157. McCormick suffers from anxiety and depression, placing her in a protected class for disability.

158. At the time of the relevant events of this Complaint, McCormick was disabled.

159. In the alternative, GardaWorld perceived McCormick as being disabled.

160. McCormick's condition constituted a physical impairment.

13

161. McCormick's condition substantially impaired one or more of her major life activities including working.

162. GardaWorld perceived McCormick's condition to substantially impair one or more of her major life activities including working.

163. GardaWorld treated McCormick differently than other similarly-situated employees based on her disabling condition.

164. GardaWorld treated McCormick differently than other similarly-situated employees based on her perceived disabling condition.

165. When McCormick first gave notice of her disability to Charles LNU, Charles LNU told her that he "could tell [McCormick] had issues."

166. Then, on or about May 16, 2022, McCormick was subjected to an investigation that was groundless and aggravated her disabilities.

167. McCormick was pushed to the point of tears, despite GardaWorld having notice of her anxiety.

168. Charles LNU then told McCormick he didn't think she could do her job because of her disabilities.

169. At all times, McCormick was fully capable of completing her essential job functions.

170. On or about May 18, 2022, Charles LNU described McCormick as a "cat with its hair standing up" despite having knowledge of her anxiety.

171. This constant harassment that McCormick faced for her disabilities constituted disability discrimination.

172. None of McCormick's able-bodied coworkers faced this kind of treatment.

173. This harassment was one of McCormick's cited reasons for leaving.

14

174. Defendant condoned, tolerated, and ratified this harassment.

175. This harassment was severe and/or pervasive.

176. This harassment was offensive to McCormick.

177. This harassment would also be offensive to any reasonable person.

178. This harassment interfered with McCormick's ability to perform her job duties.

179. This harassment was based on McCormick's sex/gender.

180. This harassment was so severe that it materially altered the conditions of McCormick's employment.

181. Any reasonable person in McCormick's place would also have no choice but to resign due to this harassment.

182. McCormick, with no other reasonable choice, was then forced to resign from her employment.

183. McCormick's resignation was a constructive termination, an adverse employment action.

184. Defendant constructively terminated McCormick's employment based on her disability.

185. Defendant constructively terminated McCormick's employment based on her perceived disability.

186. Alternatively, Defendant's cited reason for McCormick's constructive termination was pretext.

187. Defendant violated the ADA when it constructively discharged McCormick based on her disability.

188. Defendant violated the ADA when it constructively discharged McCormick based on her perceived disability.

15

189. McCormick suffered emotional distress as a result of Defendant's conduct, and is entitled to emotional distress damages pursuant to the ADA.

190. As a direct and proximate result of Defendant's conduct, McCormick suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## COUNT V: RETALIATION

191. McCormick restates each and every prior paragraph of this complaint as if it were fully restated herein.

192. As a result of Defendant's discriminatory conduct described above, McCormick complained about the discrimination she experienced.

193. On or about the morning of May 18, 2022, McCormick contacted Brandenburg and made protected complaints saying that she felt targeted and harassed for her disabilities and sex/gender.

194. The following morning of May 19, 2022, McCormick was constructively discharged.

195. The temporal proximity between McCormick's protected complaints and her constructive discharge implies she was dismissed in retaliation for her protected complaints.

196. Defendant's actions were retaliatory in nature based on McCormick's opposition to the unlawful discriminatory conduct.

197. Pursuant to Title VII and R.C. §4112.02(I), it is an unlawful discriminatory practice to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice.

198. McCormick suffered emotional distress as a result of Defendant's conduct, and is entitled to emotional distress damages pursuant to Title VII and R.C. § 4112.01 *et seq.*

16

199. As a direct and proximate result of Defendant's retaliatory discrimination against and constructive termination of McCormick, she has suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

<u>**DEMAND FOR RELIEF**</u>

WHEREFORE, McCormick demands from Defendant the following:

a) Issue a permanent injunction:

    i.    Requiring Defendant to abolish discrimination, harassment, and retaliation;

    ii.    Requiring allocation of significant funding and trained staff to implement all changes within two years;

    iii.    Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal responsibility to promptly investigate complaints and/or take effective action to stop and deter prohibited personnel practices against employees;

    iv.    Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and

    v.    Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

b) Issue an order requiring Defendant to expunge her personnel file of all negative documentation;

c) An award against each Defendant for compensatory and monetary damages to compensate McCormick for physical injury, physical sickness, lost wages, emotional

17

distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

d) An award of punitive damages against each Defendant in an amount in excess of $25,000;

e) An award of reasonable attorneys' fees and non-taxable costs for McCormick's claims as allowable under law;

f) An award of the taxable costs of this action; and

g) An award of such other relief as this Court may deem necessary and proper.

18

Respectfully submitted,

/s/ Matthew Bruce
Matthew G. Bruce (0083769)
    Trial Attorney
Evan R. McFarland (0096953)
**SPITZ, THE EMPLOYEES' LAW FIRM**
Spectrum Office Tower
11260 Chester Road, Suite 825
Cincinnati, Ohio 45246
Phone: (216) 291-0244
Fax: (216) 291-5744
Email: matthew.bruce@spitzlawfirm.com
Email: evan.mcfarland@spitzlawfirm.com

Attorneys for Plaintiff Kara McCormick

## JURY DEMAND

Plaintiff Kara McCormick demands a trial by jury by the maximum number of jurors permitted.

/s/ Matthew Bruce
Matthew G. Bruce (0083769)
    Trial Attorney
**SPITZ, THE EMPLOYEES' LAW FIRM**

19